## Armstrong Estate

Before Klein, P. J., Bolger, Hunter, Lefever, Saylor and Shoyer, JJ.

*S. Lloyd Moore*, for exceptant.
*Irvin Stander*, contra.

SAYLOR, J., July 1, 1955.—The Presbyterian Home for Aged Couples and Aged Men, hereafter called the home, filed exceptions to the decision of Hunter, J., dismissing its appeal from the transfer inheritance tax appraisement as modified by the allowance of certain deductions. In the appraisement the register of wills included cash items of $5,500 paid to the home by decedent on or shortly after his admission as an occupant for life, and an item of $9,300 (less administration fees) in cash found in decedent's safe deposit box after his death.

The home claims that it was not a creditor of decedent for any amounts paid or to be paid by him as a condition of his admission but was the owner of all property of decedent by absolute and unconditional transfer made prior to his death and in no way affected by such event, and that accordingly there was no transfer inheritance tax due.

The hearing judge found that decedent's agreement with the home contained such a reservation with respect to the transaction as to make the amounts above recited taxable because the transfer was intended to take effect in possession and enjoyment at or after the donor's death. The learned hearing judge also ruled that the provision of section 2 of the Act of June 20, 1919, P. L. 521, as amended, 72 PS §2302, allowing deductions of decedent's debts "to the extent that they were contracted bona fide and for an adequate and full consideration in money or money's worth", was properly applicable to the cash or property actually received by the home prior to decedent's death and of which at that time the home was in complete control.

The only deductions allowed by the hearing judge were the amounts paid by the home for decedent's funeral ($232) and an allowance for board of $15 a week for 38 weeks ($570), that being the rate set forth in the agreement between the parties.

The Commonwealth's claim for taxes is based on section 1 of the Act of June 20, 1919, P. L. 521, as amended, 72 PS §2301, imposing a tax on transfers "in contemplation of the death of the grantor, . . . or intended to take effect in possession or enjoyment at or after such death".

Was decedent's transfer of his property to the home made under such circumstances? If so, then there is reason to consider the further provisions of the section which state that when such a transfer is made within one year prior to the death of the grantor or is

"in the nature of a final disposition or distribution" of his estate, and there is no "adequate valuable consideration, it shall, unless shown to the contrary, be deemed to have been made in contemplation of death within the meaning of this clause".

A careful study of the circumstances of the transaction and the provisions of the documents relating thereto is necessary to determine the fact situation at the time the tax statute became operative, if so it did. There is need to consider whether the agreement between the parties was in the nature of an executory contract and whether the grantor reserved an equitable estate in his property which could cause a reverter to him upon total or partial failure of support by the home until death and hence a failure of consideration.

The facts are largely agreed upon by stipulation of the parties.

On February 15, 1952, at the age of 76 years and 11 months, decedent executed and delivered to the home an instrument of transfer under seal whereby he agreed to comply with the rules and regulations of the home and transferred and set over unto it all of his property, real, personal and mixed, whether in possession, expectancy or in reversion or remainder that he was then or might thereafter become entitled to in consideration of the donor's being placed under the charge of the home for life. By the same instrument the donor appointed the home his attorney to collect and receive all of his property and to do and perform any other act in connection therewith as fully and effectually as he could do if personally present. Donor stated in his application for admission to the home that he proposed to dissolve his Overbrook Manor Corporation and turn over the proceeds of such liquidation.

On February 26, 1952, the donor executed under seal a second document which incorporated the first by reference, and provided, inter alia, that he agreed to conform to the rules of the home and that if he desired to leave it he might do so without the admission fee being refunded to him.

This latter document then provided, somewhat contradictorily, as follows:

"Any resident of the Home who desires to permanently leave the Institution for any cause shall be permitted to do so, after approval by the Board, and the admission fee shall be returned after deduction therefrom of the amount of board for the time spent in the Home, at the rate of fifteen dollars per week, per person, and he or she shall not be eligible for readmission. Any surplus funds shall also be returned to the individual, either in kind or its equivalent in cash, values to be ascertained as of the date of such withdrawal where return is made in cash."

The bylaws of the home provide for "Withdrawal or Dismissal of a Member of the Family" upon conditions, inter alia, as follows:

"(1) Any Member of the Family who desires voluntarily to leave the Home permanently for any cause shall be permitted to do so, after approval by the Board of Managers;

"(2) Any Member of the Family who fails to observe the Rules and Regulations of the Home or any agreement contained in the application for admission shall be subject to immediate dismissal from the Home; or if the continued residence of said Member in the Home is prejudicial to the best interests of the Home, he or she shall be subject to immediate dismissal; or, if it be found at any time that falsehood, deceit or fraud has been practiced in any particular by or on behalf of any Member of the Family against the best

interests of the Home, he or she shall be subject to immediate dismissal. . . .

"(3) Where a Member of the family is dismissed or voluntarily withdraws from the Home, one-half of the total amount of the Admission Fee paid and one-half of the value of the Family Surplus held for said account, if any, less the board of said dismissed or withdrawal member at $10.00 a week during residence and less all interest paid on surplus, shall be returned to said individual. In their absolute and sole discretion, the Board of Managers may determine to award the remaining one-half of said sum, if any, to said member, either immediately or at a specified future date, and in exercising said discretion they shall take into consideration the flagrancy of the case, or, in the event that the Member of the Family is voluntarily withdrawing, they shall consider whether the decision to withdraw is made in anticipation of death to the financial detriment of the Home. . . ."

On February 26, 1952, on his admission to the home, the donor paid the admission fee of $1,000 and an additional $1,000. On April 21, 1952, he paid an additional $3,500. The total amount paid, $5,500, was in possession of the home thenceforth.

On or about March 24, 1952, decedent received $11,433.23 from the liquidation of Overbrook Manor Corporation. On April 21, 1952, he received an additional $3,500 which he paid the home as aforementioned. Apparently the balance represented by cash was placed in the safe deposit box decedent rented at his bank on March 7, 1952, and visited by him on seven occasions. On November 11, 1952, he died while still a resident of the home. There then remained in the safe deposit box $9,300 in cash.

Decedent's will, dated June 23, 1950, was probated and letters testamentary were issued to his executors on June 20, 1953.

On May 17, 1954, the Register of Wills of Philadelphia County made an appraisement in two parts for inheritance tax purposes. One specified as transfers within a year of death the amount of $5,500 paid the home, the other specified cash of $9,300, less debts and deductions of $1,049.81, or $8,250.19. Against $13,750.19 a tax of $1,237.53 was assessed.

This case does not involve any property rights as between decedent and the home. There is no claim by decedent's executors or heirs that the home is not entitled to the net estate. The controversy is limited to the question whether the moneys paid to the home and the cash withheld by decedent, contrary to the terms of his agreement, are taxable under the Transfer Inheritance Tax Act.

We are dealing here with an agreement entered into between an aged man and a charitable institution created to care for the poor in their declining years. There is no doubt as to the legality and moral propriety of contracts of the nature of that here involved. However, such contracts must be read in a different light from those entered into by parties dealing at arm's length. Homes for the aged are not operated as business ventures.

The documents evidencing the agreement before us contain clauses intended to provide protection for the parties in the event that there is a termination of the relationship they establish. The home is permitted to dismiss the "Member of the Family" if his conduct calls for such dismissal by the board administering the home. He may be dismissed if he fails to observe its rules and regulations, or if he is found to have practiced falsehood, deceit or fraud against the best interests of the home. Presumably his withholding of the prompt transfer of all of his property could be interpreted as such conduct. It may be that possible misrepresentation of his physical condition could be so

interpreted. The home is not a hospital and its managers might find it necessary to remove a member if he becomes invalid or infirm.

Likewise the member is not obliged to continue residence in the home. He may elect to withdraw therefrom and request return to him of that portion of his property to which under the agreement he is entitled. He must obtain the approval of the board in so doing because there must be agreement of the parties on the amount to be repaid. That calls, inter alia, for calculation of the cost of the member's board during his residence.

It does not follow that approval of the member's withdrawal can be capriciously or unreasonably withheld. No man or board operating an institution could require continued residence against a resident's will. To do so would result in involuntary imprisonment. Hence the phrase "approval of the Board" can relate only to procedure and cannot be employed by the managers of the home to bar the return to the member of such of his property as he is entitled to on withdrawal.

In our opinion the rights reserved to both parties are of that importance and nature which make it impossible to find that, as appellant contends, there was so absolute an assignment of all of decedent's property as to preclude the imposition upon any part of it of a transfer inheritance tax. Admittedly decedent never exercised his right to withdraw and the home never dismissed him. But it is a matter of no consequence that there was no occasion for its board to act upon any request for the return to decedent of any portion of the admission fee or of the surplus funds.

We are concerned with the right reserved to decedent, not with its exercise or nonexercise. The reservation of the right to withdraw and receive back a portion of his property continued throughout decedent's life as a so-called "Member of the Family". Until his

death by retaining the power over the final disposition of his property, whether paid over to the home or retained by him, decedent continued to enjoy an interest in that property. That interest ceased only at his death. Then and only then did his right to withdraw from the home or its right to dismiss him therefrom actually terminate.

The purchase of support at the home for decedent's remaining years was almost of the character of a reserved life estate in the property he had transferred. That property was in a sense "trusteed" to the home. Upon the withdrawal or dismissal of the member the "trust" terminated and the trust res, less deductions for support, had to be returned to the donor. Only on his death did the right of recovery cease to exist. Only then could the home become, as remainderman, possessed of such title to the transferred property as to place it finally beyond the control and dominion of the donor.

Here the death of the donor effected such transfer of interest. Thereupon the home came into full and undisputed title and possession of the principal of the trust res. There is no dispute as to that. The auditing judge, without contest, has awarded the net estate to the home in the adjudication filed concurrently with his opinion in this tax appeal, on March 29, 1955.

But that did not relieve the fund of the burden of the transfer inheritance tax. As was said by the lower court in Wilson's Estate, 40 D. & C. 468, 473 (1940), where in transferring real estate the grantors reserved the right of support by the grantees and created life interests which the court found to be taxable:

"As between the parties to this agreement it was sufficient and binding; but the Commonwealth obtrudes itself into the picture, and is entitled to tax upon the fair value of the premises as appraised.

"Among the factors of this agreement was a right on the part of the trustee and grantors to terminate the same, paying to the grantees certain sums of money. If this contract had been terminated upon the death of the decedent-survivor, the amount which the grantees were entitled to would have been $470. . . ."

The facts before us are not dissimilar to those in Stone Estate, 81 D. & C. 60 (1952), wherein decedent died in a home where she had resided for over 18 years after executing an agreement of transfer of all of her property, including any thereafter acquired by her. The agreement provided that if the member permanently left the home its treasurer was to retain only $500 and such further sum as would reimburse the home for the board and care of the member for the entire term she was an inmate. Decedent at her death was found to have maintained bank accounts which she never transferred to the home. The home claimed these deposits as a creditor of decedent. The court allowed as a deduction, under the provisions of section 2 of the Transfer Inheritance Tax Act of 1919, as amended by the Act of May 27, 1943, P. L. 757, the sum of $500 and $3 a week for the period the member resided in the home. The difference between that sum and the balance of the bank accounts, less administration expenses, was held to be taxable.

The home in the instant case seeks to differentiate the situation by claiming that it is not a creditor of decedent but an owner-assignee of his property, and that such relationship has been found by the hearing judge. We do not think the distinction is important. In Stone Estate, 81 D. & C. 61-62, supra, the member assigned and set over to the home "all money on deposit to my credit in any bank or other depository and all my other personal property whatsoever" and authorized the home as attorney-in-fact "to sell and dispose of all estates, real and personal, of every description

to which I shall hereafter or may now be entitled, and to apply and use all the said estates for the support of the said Home".

That was what decedent here did. While the court in Stone Estate did not discuss the effect of the assignment as qualified by the reservation of the right of recovery by the member upon permanently leaving the home, there is no doubt the court did not consider the assignment to be absolute when made. After a careful review of the authorities, it concluded at page 71:

"If the sole question to be determined in the instant case was whether the instrument . . . constituted a transfer whereby decedent divested herself of all control and power over her property, then under the criterion laid down by our Supreme Court in Glosser Trust, and Todd Estate, both supra, it would appear that the transfer did not take effect prior to but only at the time of the death of the decedent, and, therefore, should be taxable."

Glosser Trust, 355 Pa. 210 (1946), involved an irrevocable trust agreement which, without any reservation of right or any discretionary power in the settlor, provided for absolute ultimate enjoyment of the income by the beneficiaries. The court found that possession or enjoyment of the trust res was not contingent on the death of settlor who had not reserved any control over the res. The fund was held not to be taxable. The court, at page 215, said:

"The criterion is not whether the beneficiaries are to acquire actual possession or enjoyment at or after the death of the donor but whether the latter has irrevocably parted with all his interest, title, possession and enjoyment in his lifetime".

In Todd Trust, 358 Pa. 530 (1948), settlor in an inter vivos trust reserved to himself income from the trust if his wife, the life tenant, predeceased him. The court, finding that settlor had not completely divested himself of all interest in the property, taxed it on his

death. It cited Glosser Trust, supra, and quoted the paragraph appearing above.

As was said in Commonwealth v. Linderman's Estate, 340 Pa. 289, 291 (1940):

"The absolving principle is that the settlor has divested himself absolutely of all title to the property, not at his death, but at the time of execution of the instrument creating the trust. There must not remain in the settlor the opportunity to change its provisions so that he may reassert dominion: Houston's Est., supra; Leffmann's Estate, 312 Pa. 236, . . . Here, it cannot be said that the settlor divested herself absolutely of *all* title to the property, as there remained in her the right to change the provisions of the trust instrument and to reassert dominion over one-third of the corpus".

"To defeat the Commonwealth's right to the tax, the grantor or settlor must part with possession, title and enjoyment," said the court in Jones Estate, 350 Pa. 120, 124 (1944), citing Dolan's Estate, 279 Pa. 582, 588, and Reish v. Commonwealth, 106 Pa. 521, 526.

It is not necessary here to consider or discuss other cases in our courts where the Commonwealth has sought to impose its tax on estates held in trust under deeds reserving to settlor a right to the income or a portion thereof. Suffice it to say that the tax has been allowed where it was found that the effect of the creation of the trust was to secure to settlor the income during his life thereby postponing until his death the taking effect of the transfer: Husband's Estate, 316 Pa. 361, 363 (1934).

Nor is there need to review other cases such as Christopher's Estate, 10 D. & C. 375 (1928); Ressler's Estate, 18 D. & C. 393 (1933); Goldstein's Estate, 29 D. & C . 536 (1937), and Wilson's Estate, 40 D. & C. 468 (1940), where contracts of the nature here considered were involved.

It seems to be clear that while the courts of this Commonwealth jealously guard the property of its citizens by strictly interpreting all tax statutes, they look to the substance and not to the form of any transaction involving the transfer of property in the lifetime of the transferor, whether he be a donor or a settlor.

It is our opinion that, whether a trust is created or a contract for support is entered into, settlor or donor must surrender completely and finally possession of, control over and right to, the entire subject matter of the trust or gift if it is not to be taxable as a transfer at his death.

We find that decedent in the instant case reserved to himself the right to recover the subject matter of his transfer to the home by action on his own part and by possible action on the part of the home. His estate, less deduction for payment of board and care to which the home is entitled, is subject to transfer inheritance tax.

Accordingly, the exceptions are dismissed and the appeal from the assessment is denied.

### CONCURRING OPINIONS

SHOYER, J., July 1, 1955.—Clearly the $5,500 transferred to the home within one year prior to the death of this 77-year-old decedent, was a material part of his estate for which his board and keep during that short period would not, in the absence of proof, constitute adequate valuable consideration. Yet appellant made no effort to prove testator's probable longevity, either by mortality tables, medical testimony, nature of last illness, or any other evidence, nor did the home show the probable cost of care and maintenance for the duration of such life expectancy. The statute expressly places this burden on the taxpayer, and in the absence of the required proof, this portion of the trans-

fer must inevitably "be deemed to have been made in contemplation of death within the meaning of" section 1(c) of the taxing statute.

Since testator retained in his name alone the title, possession and enjoyment of the $9,300, which is the subject matter of the accounting by his personal representative, this latter fund clearly was not transferred to the possession and enjoyment of the home until after his death, and is also taxable. It has been held repeatedly that the criterion is whether or not decedent "has irrevocably parted with all his interest, title, possession and enjoyment in his lifetime": Glosser Trust, 355 Pa. 210, 215; Todd Trust, 358 Pa. 530, 534. As stated by our court in Goldstein's Estate, 29 D. & C. 536, 540, the fact that the after-death transfer results from the alleged fraud of decedent alone will not relieve the innocent party of the burden of the tax.

For the above reasons, rather than those stated in the majority opinion, I would dismiss the exceptions.

LEFEVER, J., July 1, 1955.—I am concerned lest the majority opinion be interpreted to rule that *in every case* property transferred and assigned by an applicant to a charitable home for the aged, which he is about to enter for permanent residence, is subject to Pennsylvania transfer inheritance tax. In my opinion, such property is not subject to transfer inheritance tax, regardless of the amount thereof, where it is shown: (1) That the property was assigned irrevocably and absolutely; (2) that the transaction was in good faith, and (3) that the assignment was not made in contemplation of death within the Transfer Inheritance Tax Act: Glosser Trust, 355 Pa. 210, 215.

In the instant case, decedent died nine months after his assignment and appellant failed to meet the burden placed upon it by the act of showing that the transfer was not in contemplation of death. Moreover, the

so-called agreement, signed by decedent under date of February 26, 1952, patently reserved a right in decedent to obtain a return of his property—the approval of the home was a perfunctory requirement.

Accordingly, I concur with the conclusion of the majority. However, in view of the tremendous strides made by medicine in prolonging the lives of our citizens and the resulting increased need of institutions to care for the aged, I am constrained to add this cautionary comment. It is my strong opinion: (1) That nothing should be done to discourage the continuance of these splendid charitable institutions which administer so admirably to the aged, and (2) that it should be clearly and unequivocally stated that property assigned to such a home by an applicant for admission is not subject to transfer inheritance tax when the requirements set forth hereinabove are met.